IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

ROBERT ARNER, *et al.*,                      )
    Plaintiffs,                              )
                           )
        v.                                      )    Civil Action No. 3:25cv319 (RCY)
                           )
HANOVER WASHINGTON LLC, *et al.*,            )
    Defendants.                              )
_____ )

**MEMORANDUM OPINION**

This is a property dispute brought by Plaintiffs Robert Arner, Carrie Arner, the Aidensfield Trust, and Kenneth Burt (collectively, "Plaintiffs"), wherein Plaintiffs allege Defendants Hanover Washington LLC ("Hanover") and Davey Resource Group, Inc. ("Davey") (collectively, Defendants") caused damage to Plaintiffs' respective properties along the South Anna River by failing to maintain and subsequently removing the Ashland Mill Dam, resulting in low water levels that negatively impacted Plaintiffs' river access, waterfront views, property value, and the benefits associated with the previously impounded water levels. The case is before the Court on Defendants' respective Motions to Dismiss. The Court dispenses with oral argument because the facts and legal contentions are adequately presented in the materials before the Court, and oral argument would not aid in the decisional process. E.D. Va. Loc. Civ. R. 7(J). For the reasons stated below, it is appropriate to grant the Motions to Dismiss.[1]

**I. RELEVANT PROCEDURAL HISTORY**

Plaintiff commenced this action on March 27, 2025, in the Circuit Court for the County of Hanover, Virginia. Compl., ECF No. 1-1. Defendant Davey removed the action to this Court

---

[1] On March 25, 2026, the Court issued an Order granting the Motions to Dismiss, promising an opinion to follow. Order, ECF No. 18. This Memorandum Opinion explains the Court's reasoning underpinning that Order.

based on the Court's original diversity jurisdiction on April 24, 2025, Not. Removal, ECF No. 1, and filed a Motion to Dismiss pursuant to Rule 12(b)(6) on that same day, Davey Mot. Dismiss, ECF No. 3; Davey Mem. Supp. Mot. Dismiss ("Davey Mem. Supp."), ECF No. 4. Plaintiffs filed their Response to the same on April 30, 2025. Pls.' Davey Resp., ECF No. 8. Davey filed its Reply on May 6, 2025. Davey Reply, ECF No. 9.

Defendant Hanover filed its Motion to Dismiss pursuant to Rule 12(b)(6) on May 15, 2025. Hanover Mot. Dismiss, ECF No. 11; Hanover Mem. Supp. Mot. Dismiss ("Hanover Mem. Supp."), ECF No. 12. Plaintiffs filed their Response on May 22, 2025, Pls.' Hanover Resp., ECF No. 14, and Hanover filed its Reply on May 28, 2025, Hanover Reply, ECF No. 15.

## II. STANDARD OF REVIEW

"A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Megaro v. McCollum*, 66 F.4th 151, 157 (4th Cir. 2023) (quoting *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992)). Federal Rule of Civil Procedure 8 only requires that a complaint set forth "'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). While the complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level," "detailed factual allegations" are not required in order to satisfy the pleading requirement of Federal Rule 8(a)(2). *Id.* (citations omitted). The plaintiff's well-pleaded allegations are assumed to be true, and the complaint is viewed in the light most favorable to the plaintiff. *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993) (citations omitted); *see also Martin*, 980 F.2d at 952.

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* "Labels and conclusions," a "formulaic recitation of the elements," and "naked assertions" without factual enhancement are insufficient. *Id.*

When deciding a motion to dismiss under Rule 12(b)(6), the Court "accept[s] as true the plaintiff's well-pleaded allegations and views all facts and draws all reasonable inferences in the light most favorable to plaintiff." *Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009). Such a standard, however, does not require accepting any unreasonable inferences or a plaintiff's legal conclusions. *Id.* Additionally, a court may consider any documents attached to the complaint. *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 448 (4th Cir. 2011). Applying these standards, the Court construes the facts in the Complaint, including its attached documents, as follows.

## III. FACTUAL ALLEGATIONS

Plaintiff Kenneth Burt purchased his riverfront property adjacent to the South Anna River in Hanover County, Virginia on March 1, 1996. Compl. ¶¶ 18–19. Plaintiffs Robert and Carrie Arner purchased their similarly situated property (through the Aidensfield Trust) on April 18, 2019. *Id.* ¶ 16. At the time of Plaintiffs' respective purchases, the Ashland Mill Dam, a man-made structure, existed downstream on Defendant Hanover's property; the dam maintained water

levels sufficient to allow Plaintiffs full access to and use of the South Anna River, including for kayaking, fishing, and recreational activities. *Id.* ¶¶ 9–10, 21–22.

Subsequent to Plaintiffs' home purchases, in approximately 2021, Hanover contracted with Defendant Davey to establish a "compensatory stream mitigation site" in the South Anna River. *Id.* ¶ 23. The project involved removing the dam to generate environmental mitigation credits. *Id.* ¶¶ 23–25. On January 5, 2023, Hanover and Davey submitted permit applications to the Virginia Department of Conservation and Recreation ("DCR") seeking approval to remove the Ashland Mill Dam. *Id.* ¶ 25; Compl. Ex. A, ECF No. 1-1 at 17.[2] On August 23, 2024, DCR approved the alteration permit authorizing removal of the dam. *Id.* ¶ 38; Compl. Ex. B, ECF No. 1-1 at 18.

Shortly before that approval, however, on or around May 27, 2024, the dam suffered a partial failure. *Id.* ¶ 26. Plaintiffs allege that the failure resulted from Hanover's failure to properly maintain and repair the dam. *Id.* ¶¶ 27, 52–53, 63. As a result of the partial failure, the river level dropped five to seven feet, making it too shallow to operate even small vessels such as canoes and kayaks; fish spawning beds were destroyed, eliminating Plaintiffs' ability to fish in the river; the Arners' water views were destroyed; and Plaintiffs' property values were diminished.[3] *Id.* ¶¶ 28–33. Plaintiffs notified Davey of this impact, and Davey employees visited Plaintiffs' properties to assess the alleged damage. *Id.* ¶¶ 34–35.[4] Despite this visit, Defendants neither repaired the dam nor compensated Plaintiffs for their alleged injuries. *Id.* ¶ 37.

---

[2] The removed Complaint document includes all its accompanying exhibits in a single uploaded file. The Court accordingly provides pincites to the appropriate page in the record, as needed.

[3] Plaintiffs also allege that that the drop in water levels "substantially impacted [their] real property rights[,]" Compl. ¶ 32, but this is a legal conclusion, not a factual allegation, and the Court need not accept it as true. *Philips*, 572 F.3d at 179–80.

[4] While the Complaint fails to identify precisely when Davey visited Plaintiffs' homes, it appears that those visits occurred at some point before the ultimate dam removal. *See id.* ¶¶ 35, 38–41. Accordingly, the Court assumes, for purposes of ruling on the instant motion, that this is the case.

Instead, sometime between September and October 2024, Davey, acting on behalf of Hanover, removed the dam in its entirety. *Id.* ¶ 40. Plaintiffs allege that the removal "exacerbated and made permanent" the damages caused by the partial failure. *Id.* ¶ 41.

### IV. ANALYSIS

Based on the aforementioned facts, Plaintiffs assert four causes of action arising from the partial failure and subsequent removal of the Ashland Mill Dam. Specifically, Plaintiffs bring a claim for private nuisance (Count I) against both Defendants, premised on both the dam's removal and its alleged partial failure. Compl. ¶¶ 42–49. Against Hanover alone, Plaintiffs assert claims for negligence (Count II), violation of the Virginia Dam Safety Act ("VDSA") (Count III), and negligence per se (Count IV), with Count II arising from the alleged partial failure and Counts III and IV arising from both the alleged partial failure and the dam's subsequent removal. *Id.* ¶¶ 69–81.

Defendants move to dismiss Count I pursuant to Rule 12(b)(6), arguing that Plaintiffs fail to allege a legally cognizable injury.[5] Hanover separately moves to dismiss Count II on the same ground and further seeks dismissal of Counts III and IV by arguing, among other things, that those statutory claims seek damages not contemplated by the VDSA.

The Court addresses the claims as follows. First, the Court considers Plaintiffs' common law tort claims for private nuisance and negligence. As explained herein, those claims fail because, to prevail, Plaintiffs must establish entitlement to the maintenance of artificially heightened water levels along their properties' portions of the South Anna River—which Virginia law does not support in the circumstances alleged here. Next, the Court dispenses with Plaintiffs' negligence

---

[5] Davey and Plaintiff expend much ink arguing over riparian rights in the context of Count I. For the reasons set forth below, the Court finds those arguments to be secondary to the more pointed challenge leveled by Hanover based on well-established principles of tort law. Because the tort principles are dispositive of the issue, the Court does not engage with the morass of riparian rights.

*per se* claim, which necessarily fails as a result of the Court's holding with respect to Plaintiffs' common law negligence claim.   Finally, the Court considers Plaintiffs' claim predicated on the VDSA and concludes that this claim fails because, whether premised on the alleged partial dam failure or the subsequent total removal of the dam, Plaintiffs do not allege injuries that the VDSA is drafted to remedy.

## A.  Common Law Tort Claims (Counts I and II)

Plaintiffs' tort claims for private nuisance and negligence are not adequately pled because, as a matter of law, Plaintiffs cannot recover for damages attributable to a natural condition.

In Count I, Plaintiffs allege that Defendants' acts gave rise to a private nuisance based on (1) Hanover's alleged failure to maintain the dam, resulting in the dam's partial failure, and (2) Defendants' subsequent removal of the dam.  Compl. ¶¶ 43–44.  Plaintiffs assert that the partial dam failure unreasonably interfered with their use and enjoyment of their properties and was later "exacerbated and made permanent" by the dam's removal.  *Id.* ¶ 44.  Specifically, Plaintiffs allege that Defendants' actions caused reduced river access and water depth, destruction of fish spawning beds, substantial impairment of the Arners' water views, and a diminution in both Plaintiffs' property rights and property values.  *Id.* ¶ 46.  In Count II, Plaintiffs assert a negligence claim, alleging that Hanover failed to properly maintain the dam, which led to a partial failure and caused the same injuries alleged in Count One.  *See* Compl. ¶¶ 46, 52–56.

As an initial matter, when a complaint pleads "both negligence and nuisance as a basis for liability, but the nuisance allegedly was the result of negligent conduct," courts "look to the object of the action, rather than its form, to determine the extent of liability."  *Philip Morris, Inc. v. Emerson*, 368 S.E.2d 268, 282 (Va. 1988).  "Merely attaching the label 'nuisance' to an action . . . does not alter [its] nature . . . ."  *Id.* (quoting *Randall v. Village of Excelsior*, 103 N.W.2d 131, 135 (Minn. 1960)).  "Where the acts or omissions constituting negligence are the identical acts

6

which it is asserted give rise to a cause of action for nuisance, the rules applicable to negligence will be applied." *Id.* (quoting *Randall*, 103 N.W.2d at 135). Here, because Plaintiffs' negligence claim for the partial dam failure and their nuisance claim (to the extent it is predicated on that same alleged failure) arise from identical conduct, the nuisance claim "stands or falls on whether [Defendants'] alleged conduct was negligent." *Cline v. Dunlora South, LLC*, 726 S.E.2d 14, 16 n.1 (Va. 2012); *see also Harless v. Williams*, 913 S.E.2d 302, 309 (Va. App. 2025). Accordingly, the Court will analyze the partial dam failure claims jointly under principles of common law negligence.

The Court proceeds in two parts: first, it addresses Plaintiffs' nuisance claim based on Defendants' removal of the dam; second, it considers Plaintiffs' negligence claim arising from the dam's partial failure.

### 1. Private Nuisance for Dam Removal

Under Virginia[6] law,

> [a] private nuisance is the using, or authorizing the use of, one's property, or of anything under one's control, so as to injuriously affect an owner or occupier of property (1) by diminishing the value of that property;[7] (2) by continuously

---

[6] Because the Court's jurisdiction in this matter is based on diversity of citizenship, 28 U.S.C. § 1332, it "must apply the choice-of-law rules from the forum state." *Wells v. Liddy*, 186 F.3d 505, 521 (4th Cir. 1999). Accordingly, the Court applies Virginia's choice-of-law rules. Because Plaintiffs' claims sound in tort, the Court applies the doctrine of *lex loci delicti*—"the law of the place of the wrong." *Insteel Indus. v. Costanza Contr. Co.*, 276 F. Supp. 2d 479, 486 (E.D. Va. 2003). Here, because the alleged wrong occurred in Virginia, Virginia law governs.

[7] Diminishing value alone, however, is insufficient to establish a nuisance. *See Batcheller v. Commonwealth*, 10 S.E.2d 529, 533 (1940) ("If there be no public or private nuisance created in the use of property, no recovery of damages can be allowed for the diminution in value of the property by reason of the lawful use of such property made by a nearby owner"). Indeed, in *Batcheller*, the Virginia Supreme Court cited favorably the following language from *Swetland v. Curtiss Airports Corp.*, 41 F.2d 929, 935 (N.D. Ohio 1930):

> No one will contend that the plaintiffs will have the same enjoyment of peace and quiet which they have had in this locality for nearly a quarter of a century. This they have been able to have because of the use to which the adjoining property was devoted, but they at no time had a right to prevent the adjoining owner from using this property for any reasonable purpose. They have been fortunate in that they have been able to enjoy their country estate as they have for so long a time. **They must now yield to change and progress of the times**.

*Id.* (emphasis added).

interfering with his power of control or enjoyment of that property; (3) by causing material disturbance or annoyance to him in his use or occupation of that property.

*Virginian Railway Co. v. London*, 76 S.E. 306, 308 (Va. 1912). "The 'term "nuisance" embraces everything that endangers life or health, or obstructs the reasonable and comfortable use of property.'" *Newport News v. Hertzler*, 221 S.E.2d 146, 150 (Va. 1976) (quoting *Barnes v. Quarries, Inc.*, 132 S.E.2d 395, 397 (Va. 1963)). "Stated another way, a private nuisance is an activity which unreasonably interferes with the use and enjoyment of another's property." *Id.* (citing Prosser, Torts § 89, pp. 591, *et seq*. (4th ed. 1971)).

> The rights protected by the law of private nuisance are far-reaching:
>
> The phrase 'use and enjoyment of land' is broad. It comprehends the pleasure, comfort and enjoyment that a person normally derives from the occupancy of land. Freedom from discomfort and annoyance while using land, which inevitably involves an element of personal tastes and sensibilities, is often as important to a person as freedom from physical interruption with use of the land itself. The discomfort and annoyance must, however, be significant and of a kind that would be suffered by a normal person in the community.

*Bowers v. Westvaco Corp.*, 419 S.E.2d 661, 665 (Va. 1992) (quoting *Foley v. Harris*, 286 S.E.3d 186, 190 (Va. 1982)). And it matters not whether the nuisance stems from a business enterprise engaging in lawful activity; such an enterprise may still be held liable for nuisance if it "becomes obnoxious to occupants of neighboring dwellings and renders enjoyment of the structures uncomfortable by virtue of, for example, smoke, cinders, dust, noise, offensive odors, or noxious gases." *Id.* at 667 (quoting *Nat'l Energy Corp. v. O'Quinn*, 286 S.E.2d 181, 182 (Va. 1982)).

Critically here, however, Virginia recognizes the general common law rule, as described in the Second Restatement of Torts, that "a possessor of land is not liable to persons outside the land for a nuisance resulting solely from a natural condition of the land." *See Cline*, 726 S.E.2d at 19 n.3 (Lemons, J., dissenting) (quoting Rest. (2d) Torts § 840(1)). Consistent with that principle, harms resulting solely from natural conditions are generally not actionable, absent a recognized exception. *Id.* at 17 (majority op.) (recognizing a "narrow" category of permissible actions for

8

nuisance based on a natural condition, "arising from nuisance caused by the encroachment of vegetation onto adjoining improved lands"). Plaintiffs point to no recognized exception, and in fact do not dispute that the Restatement accurately reflects the law. Pls.' Hanover Resp. 12.

Hanover posits that this rule defeats Plaintiffs' nuisance claim for the complete removal of the dam.[8] Hanover Mem. Supp. 7–8. Despite acknowledging that the Restatement presents an accurate statement of the law, Plaintiffs nevertheless argue this rule is "irrelevant" because they do not allege depletion of the river due to natural phenomena such as evaporation or climate change, but rather that the river and their properties were "intentionally and knowingly impacted by Hanover Washington for its own profit." Pls.' Hanover Resp. 12. That argument is unpersuasive. While Hanover's conduct may have altered the river's flow, the condition of which Plaintiffs complain is the river's return to its natural level following the removal of an artificial impoundment. Thus, the alleged injury flows from the absence of an artificial condition and the watercourse's return to its natural state.

Plaintiffs cite no case law supporting a cause of action for private nuisance stemming from such restored natural circumstances. Indeed, while Plaintiffs argue that "diversion of water is a private nuisance . . . regardless of whether the water volume is increased or decreased," *id.* at 12 (collecting cases), none of Plaintiffs' cited cases support that proposition in the context presented here—namely, the removal of a dam resulting in the *restoration* of natural water levels. To the contrary, the cases upon which Plaintiffs rely involve affirmative acts that divert, obstruct, or otherwise interfere with the natural flow of a watercourse. *See Mattaponi Indian Tribe v. Commonwealth*, 72 Va. Cir. 444, 451–52 (Newport News Cir. Ct. 2007) (concerning a challenge

---

[8] Even though this is not the argument for dismissal upon which Davey rests, the Court can nevertheless grant Davey's Motion to Dismiss based on the grounds articulated by Hanover, because Plaintiff was fairly given notice of such arguments for dismissal and had the opportunity to respond by way of articulating their opposition to Hanover's Motion to Dismiss. *Cf. Robertson v. Anderson Mill Elem. Sch.*, 989 F.3d 282 (4th Cir. 2021) (endorsing *sua sponte* 12(b)(6) dismissal where the plaintiff is "afforded notice and an opportunity to . . . respond").

to the construction of a reservoir upstream from the Mattaponi Reservation that would **withdraw** water from the Mattaponi River and thereby interfere with rights the tribe claimed under the 1677 Treaty at Middle Plantation); *Purcellville v. Potts*, 19 S.E.2d 700, 703 (Va. 1942) (involving a mandatory injunction requiring a municipality to dismantle dams that **diverted** water from the natural channel of a stream and diminished the flow available to downstream riparian owners); *Southern Ry. Co. v. Watts*, 114 S.E. 736, 737 (Va. 1922) (arising from the conversion of a trestle into a fill that **diverted** a creek and caused the plaintiff's property to become swampy); *Claytor v. Anthony*, 56 Va. 518 (1860) (discussing, in general terms, merely the principle that a proprietor may not **divert** or **obstruct** a running stream); *Lynnhaven Dunes Condo Ass'n v. City of Virginia Beach*, 733 S.E.2d 911, 912–13 (Va. 2012) (concerning "an artificial strip of land . . . that **cuts off** [Plaintiff's] connection to the Chesapeake Bay). Each of these cases involves the creation of a condition that alters the natural flow of water to the plaintiff's detriment—not the removal of an artificial structure resulting in the restoration of natural conditions.[9]

Nor does it avail Plaintiffs that the resulting condition allegedly diminished the value of their properties. As explained *supra* note 7, "[i]f there be no public or private nuisance created in the use of property, no recovery of damages can be allowed for the diminution in value of the property by reason of the lawful use of such property made by a nearby owner." *Batcheller*, 10 S.E.2d at 533.

---

[9] The Court is not inclined to find that, based on the amount of time it stood impounding water, the dam created a new "natural" condition, alteration of which can then give rise to a nuisance claim, given case law the Court has identified as persuasive for the proposition that, to constitute a "new natural," an artificial condition must have an element of permanence, and specific-purpose dams such as the Ashland Mill Dam at issue here, *see* Compl. Ex. A, ECF No. 1-1 at 17 ("The Ashland Mill Dam was formerly used for hydromechanical power to operate a mill and is now obsolete."), do not qualify as sufficiently permanent to trigger this rule, *see, e.g.*, *Mitchell Drainage Dist. v. Farmers' Irr. Dist.*, 256 N.W. 15, 20–21 (Neb. 1934) ("A dam is generally held to be a structure for a specific and temporary purpose, although of course it may continue for many years.); *accord Lake Drummond Canal & Water Co. v. Burnham*, 60 S.E. 650, 652 (N.C. 1908); *cf. Clement v. State Recl. Bd.*, 220 P.2d 897, 903 (Ca. 1950) (noting that a "new condition will be regarded as though it were a natural one, its artificial origin being then disregarded by the law," only if, among other elements, "the creator of the artificial condition intended it to be *permanent*" (emphasis in original)).

Accordingly, because the condition of which Plaintiffs complain is the consequence of a natural condition, albeit a restored one, Plaintiffs have failed to state a claim for private nuisance based on the dam's removal.

2. Negligence for Partial Dam Failure

As to negligence, under Virginia law, a plaintiff must above all else allege the existence of a legal duty owed by the defendant. *Jordan v. Jordan*, 257 S.E.2d 761, 762 (Va. 1979) ("To constitute actionable negligence, there must be a legal duty, a breach thereof, and a consequent injury which could have been reasonably foreseen by the exercise of reasonable care and prudence."). "With regard to property, the common law requires that 'every person [must] exercise ordinary care in the use and maintenance of his own property to prevent injury to others.'" *RGR, LLC v. Settle*, 764 S.E.2d 8, 17 (Va. 2014) (citing *Perlin v. Chappell*, 96 S.E.2d 805, 808 (Va. 1957)). That duty, however, is limited. Under Virginia common law, as stated by the Virginia Supreme Court in *Cline v. Dunlora South, LLC*, landowners have "no duty to those outside the land with respect to **natural conditions** existing on the land." 726 S.E.2d at 17 (emphasis added); *id.* at 16; *see also RGR, LLC*, 764 S.E.2d at 17 (recognizing that the common law duty of reasonable care "did not extend to natural conditions existing on land as opposed to artificial conditions")).

While the facts underlying *Cline* are inapposite to the circumstances of the present case—*Cline* involved trees rooted in private property overhanging a public roadway—the logic and core holding of the case remain instructive. Specifically, the Virginia Supreme Court made clear that it "has never recognized that principles of ordinary negligence apply to natural conditions on land," 726 S.E.2d at 16, and that when the relief sought is predicated on a theory that a landowner failed to act to protect another from the natural conditions of the land, such a claim must still be grounded in a cognizable duty on the part of the landowner. *Id.* at 18. In other words, a landowner's inaction

11

with respect to a natural condition does not, in and of itself, give rise to negligence liability. *Id.* Such reasoning forecloses Plaintiffs' theory of negligence, because Plaintiffs here ultimately seek to impose liability not for any discrete affirmative act directed at Plaintiffs' property, but for Defendants' alleged failure to act to prevent the river from resuming its natural level and flow in conjunction with the dam's partial failure. In other words, the alleged injury flows from the river's natural condition, while the asserted duty is one to prevent or reverse that condition. But absent a recognized duty to maintain the dam or to otherwise artificially sustain non-natural water levels, *Cline* forecloses the imposition of negligence liability based solely on a failure to prevent that natural condition from taking hold.

Plaintiffs rely on *Smith v. Youmans*, a case decided by the Wisconsin Supreme Court in 1897, to argue that they "had every right to expect that the river would remain as it had been for a century," meaning they had every right to expect Defendants to maintain the Ashland Mill Dam in perpetuity. Pls.' Hanover Resp. 9 (citing *Smith v. Youmans*, 70 N.W. 1115 (Wis. 1897)). Although *Smith* did involve plaintiffs suing the owner and operator of a downstream dam for letting water levels drop to the detriment of their enjoyment of their riparian properties, the Court does not find *Smith* to constitute persuasive precedent in support Plaintiff's position, for two reasons.

First, the court in *Smith* based its determination that the artificial condition of water created by the dam "bec[ame] a substitute for the natural condition," and thus that the defendants were required to maintain the dammed water levels, due to its finding of a prescriptive easement. 70 N.W. at 1117 ("[T]he artificial state or condition of flowing water, **founded upon prescription**, becomes a substitute for the natural condition previously existing, and from which a right arises . . . to have the new condition maintained." (emphasis added)). Plaintiffs neither allege nor argue

that such prescriptive interests exist here. *See generally* Compl; Pls.' Davey Resp; Pls.' Hanover Resp.

But even if the Court were to find that a prescriptive easement existed in this case, Plaintiffs overlook a key factual distinction between *Smith* and the case at bar. The Supreme Court of Wisconsin made clear that its holding rested on the fact that the dominant landowner—the defendant owner and operator of the at-issue dam—"retain[ed] and insist[ed] upon their easement to keep and maintain the dam." *Smith*, 70 N.W. at 1118. The Court accordingly held that, because the defendants "have not and do not propose to abandon or surrender [their] easement[,] [t]hey are certainly bound to exercise their rights [with respect to operating the dam and thereby impacting plaintiffs' water-adjacent properties] in a fair and reasonable manner, . . . and not capriciously or wantonly, so as to prejudice the existing rights and interests of the plaintiffs as riparian owners." *Id.* Critically, the Supreme Court of Wisconsin went on to note—

> We have no doubt but that the **defendants may abandon their water rights and easement**, so as to escape all liability at law for consequent damages, if they are not bound by law or agreement to maintain the higher level of the waters in the lake . . . . But here, as stated, **there has been no abandonment or surrender**, and the case must be determined upon the equitable grounds arising out of the special facts found by the trial court.

*Id.* (emphasis added). In stark contrast, Defendants here have clearly abandoned any purportedly existing easement interest, insofar as they let the dam fall into disrepair and proactively sought its removal. They in no way seek to exercise dominant-tenement rights over Plaintiffs' previously submerged lands. Thus, despite its outcome appearing to favor Plaintiffs' position, *Smith* actually constitutes precedent favoring *Defendants*, insofar as it affirms the proposition that dominant-parcel landowners subject to a prescriptive easement may at will abandon their exercise and use of the easement, if there is no law or agreement requiring them to maintain existing conditions.

This reading comports with what appears to be the majority approach, as identified by the United States District Court for the Eastern District of Kentucky when faced with a similar issue

13

in *Green v. City of Williamstown*, 848 F. Supp. 102, 104–06 (E.D. Ky. 1994). After observing that "[t]he question of whether a dam owner who creates an artificial lake has a duty to maintain the water levels for the benefit of upper riparian owners is a novel issue under Kentucky law," *id.* at 105, the court applied the rule that "[w]here the highest court has not spoken, a federal court must ascertain from all available data what the state law is and apply it," *id.* at 106 (citing *Ray Indus. v. Liberty Mut. Ins. Co.*, 974 F.2d 754, 758 (6th Cir. 1992)). The District Court for the Eastern District of Kentucky found compelling the Supreme Court of Nebraska's case, *Kiwanis Club Foundation, Inc. v. Yost*, 139 N.W.2d 359 (Neb. 1966), wherein that court was faced with facts and a legal plea almost identical to that presented in the instant case. *See Green*, 848 F. Supp. at 106 (considering *Yost*).

In *Yost*, the plaintiffs had acquired and improved property upstream of a dam, and the defendants thereafter acquired, damaged, and partially destroyed the dam, injuring the plaintiffs' "favorable water level situation." 139 N.W. at 360. The plaintiffs asked the court to enjoin the defendants from damaging or destroying the dam further and that the defendants be ordered to replace and repair the portion of the dam already damaged and destroyed, so as to return water levels to their earlier, long-maintained artificial levels. *Id.* The Supreme Court of Nebraska surveyed (albeit without much citation) "many occasions" where courts had considered the issue. *Id.* While it acknowledged that some courts *had* "sustain[ed] the right of upper riparian owners to continuation of conditions established by dams below them" on a given waterway, it observed that the bases for such decisions varied widely. *Id.* The Supreme Court of Nebraska proceeded to identify and adopt the "majority rule," in line with the Supreme Courts of Massachusetts, Michigan, and Rhode Island, and as also stated in various treatises, that

> [w]here a dam has been built for the private convenience and advantage of the owner, he is not required to maintain and operate it for the benefit of an upper riparian proprietor who obtains advantages from its existence; and that the

> construction and maintenance of such a dam does not create any reciprocal rights in upstream riparian proprietors based on prescription, dedication, or estoppel.
>
> The owner of a dam and the prescriptive right to overflow the land of upper riparian owners may abandon his rights, and may also return the river to its natural state by removing or destroying the dam.

*Id.* at 361 (citing 93 C. J. S., Waters, § 147, p. 865; 56 Am. Jur., Waters, § 159, p. 626; *Taft v. Bridgeton Worsted Co.*, 130 N. E. 48 (Mass. 1921); *Drainage Bd. v. Village of Homer*, 87 N.W.2d 72 (Mich. 1957); *Hood v. Slefkin*, 143 A.2d 683 (R.I. 1958)).

As the district court in *Green* found *Yost* sufficiently persuasive to conclude that Kentucky would adopt the majority rule, so too does this Court with respect to Virginia. *See Green*, 848 F. Supp. at 106–07. Accordingly, the Court here adopts and applies the majority rule that "the mere fact that a property owner has used or improved his property with reference to an artificial [water level] created by another's dam does not confer the property owner with property rights in the continued water level." *Id.* at 106.

Plaintiffs' reliance on *McGehee v. Tidewater Railway Co.*, 62 S.E. 356 (Va. 1908), *see* Pls.' Hanover Resp. 14, does not persuade the Court that Virginia would come out contrary to the majority rule. In *McGehee*, a defendant-created artificial condition caused waters to flood the plaintiff's property. 62 S.E. at 356. The Supreme Court of Virginia reiterated "that golden maxim of the law, that one must so use his own property as not to injure the rights of another." *Id.* It went on to reason that—

> The general rule fairly deducible from the authorities is that, with respect to natural streams of water, that is to say, such streams as usually flow along fixed channels having beds and banks—one riparian owner has no right, **in the improvement or protection of his own premises,** no matter how careful he may be, to interfere with or obstruct the flow of the water in such manner as to occasion injury to the land of another riparian proprietor.

*Id.* at 357 (emphasis added). The Court reads this language to say nothing different from that which it has already acknowledged: a riparian landowner cannot *create* an artificial condition that

15

negatively impacts other riparian landowners. *See supra* Part IV.A.1 (acknowledging Plaintiffs' collected case law involving affirmative acts that divert, obstruct, or otherwise interfere with the natural flow of a watercourse). But that is not the issue in this case. As has been repeated numerous times, this case involves the *removal* of an artificial condition impounding the waters of the South Anna River and a return to the river's natural state. *McGehee* does not address this fact pattern.[10] And so, in the absence of controlling Virginia precedent, the Court reiterates its adoption of the majority rule and finds no duty on the part of Defendants, such that their failure to preserve and maintain the Ashland Mill Dam can constitute negligence.

In sum, Plaintiffs seek recourse for injuries stemming from a natural condition. Virginia law imposes no duty on a landowner—riparian or otherwise—to prevent or remedy such conditions in the absence of an independent legal obligation. And because Plaintiffs identify no independent obligation on the part of Defendants, in law or agreement, to restore and maintain the Ashland Mill Dam, Plaintiffs fail to state a claim for either private nuisance or negligence. Counts I and II therefore fail.

## B. Negligence *Per Se* (Count IV)

Based on the Court's holding with respect to Plaintiffs' attempted negligence claim, Plaintiffs' negligence *per se* claim in Count IV—ostensibly predicated on the alleged violation of the VDSA—necessarily fails, as well. The Virginia Supreme Court has made clear that, "under Virginia law[,] 'the doctrine [of negligence *per se*] applies only where there is a common-law cause of action.'" *Parker v. Carilion Clinic*, 819 S.E.2d 809, 824 (Va. 2018) (quoting Charles E.

---

[10] Additionally, the rule statement provided by the Virginia Supreme Court in *McGehee*, immediately following the above-quoted language, was clearly limited to surface waters—which are not at issue in the present case. *McGehee*, 62 S.E. at 357 ("And the qualified rule of the common law in this State, **with regard to surface water** (in a case such as we are considering), imposes upon the lower land owner, in the betterment or protection of his own property, the duty of exercising his rights, not wantonly, unnecessarily, or carelessly, but in good faith and with such care as not to needlessly injure the upper owner." (emphasis added)).

Friend, Personal Injury Law in Virginia, § 2.3.2(A), at 23 (3d ed. 2003 & Supp. 2017)). As such, "[t]he doctrine . . . does not create a cause of action where one did not exist at common law," and it "does not create a duty of care." *Id.* (quoting *Friend*, § 2.3.2(A), at 23). "In other words, a statute may define the **standard** of care to be exercised where there is an underlying common-law duty, but the doctrine of negligence *per se* does not create a cause of action where none otherwise exists." *Id.* (emphasis added) (quoting *Williamson v. Old Brogue, Inc.*, 350 S.E.2d 621, 624 (Va. 1986)). "The absence of an underlying common-law duty renders the presence of a statutory standard of care irrelevant." *Id.*

Accordingly, even if Plaintiffs had satisfactorily alleged a violation of the VDSA (which, for the reasons discussed below, they do not), that alone does not give rise to a negligence *per se* claim under Virginia law, because no negligence cause of action otherwise exists with respect to the maintenance and/or removal of an artificial impoundment of water. *See supra* Part IV.A.2. Count IV will therefore be dismissed part and parcel with Count II.

## C.  VDSA Claim (Count III)

Count III asserts liability based on the Virginia Dam Safety Act, Va. Code Ann. §§ 10.1-604, *et seq.*, for damages resulting from both the partial failure of the dam and its subsequent removal. Compl. ¶¶ 63–65, 74, 77. This claim fails for two independent reasons. First, the VDSA establishes civil liability only for damages resulting from the operation or failure of a dam (e.g., the alleged partial failure underlying the instant action), but not a dam's removal, meaning Count III is without merit to the extent it is based on Hanover's removal of the Ashland Mill Dam. Second, with respect to the failure-to-maintain aspect of Count III, Plaintiffs do not allege injuries cognizable under the VDSA and therefore do not have standing to sue under the Act. Accordingly, Count III must be dismissed.

1.  The VDSA Does Not Impose Liability for Damages Stemming from Dam Removal

The Court concludes that Count III fails to the extent it asserts that Defendant is liable under the VDSA for damages arising from the removal of the Ashland Mill Dam, because the VDSA's civil liability provision does not encompass dam removal.

The VDSA generally regulates the construction, operation, and maintenance of dams in the Commonwealth.  *See* Va. Code Ann. §§ 10.1-604, *et seq.*  The only section of the VDSA establishing civil liability is § 10.1-613.4, entitled "Liability of owner or operator."  Subsection A of § 10.1-613.4 provides:  "The owner or operator [of a dam] shall be responsible for liability for damage to the property of others or injury to persons, including the loss of life[,] resulting from the **operation** or **failure** of an impounding structure."  Va. Code Ann. § 10.1-613.4(A) (emphasis added).  As previously described and as relevant to the present discussion, Plaintiffs endeavor to use this subsection to hold Defendant Hanover "strictly liable" for Hanover's intentional removal of the dam.  Compl. ¶¶ 57–68 (alleging, *inter alia*, that Hanover had a statutory duty to maintain the dam in good repair and to operate the dam in a manner that would not cause harm to the property of others).  But as Hanover points out, removal is not encompassed by either maintenance or operation.[11]

Because the VDSA has not been interpreted by Virginia courts, the Court begins its interpretive analysis with the statute's plain language.  *See Crespo v. Holder*, 631 F.3d 130, 135 (4th Cir. 2011); *Miller & Rhoads Bldg., LLC v. City of Richmond*, 790 S.E.2d 484, 486 (Va. 2016) ("[T]he paramount principle of statutory interpretation is 'to interpret the statute as written.'" (quoting *City of Lynchburg v. Suttenfield*, 13 S.E.2d 323, 326 (Va. 1941))).

---

[11] Plaintiffs do not address this aspect of Hanover's argument for dismissal directly and instead pivot to arguing that the removal of the dam is relevant insofar as it made permanent the damages caused by the dam's partial failure.  Pls.' Hanover Resp. 15.  While this could be construed as waiver of the removal aspect of Count III, for the sake of thoroughness, the Court engages with Hanover's argument.

As already quoted, § 10.1-613.4 establishes civil liability only for damages "resulting from the operation or failure of an impounding structure."  Neither of these terms are defined in the VDSA's "Definitions" section.  *See* Va. Code. Ann. § 10.1-604.  In the absence of an assigned definition, the Court reads the words to carry their ordinary meaning, *see Commonwealth v. Hill*, 82 S.E.2d 473, 476 (Va. 1954) (utilizing a dictionary to interpret an undefined statutory term); *see also United States v. Chaudhri*, 134 F.4th 166, 179 (4th Cir. 2025) (same), and will decline Plaintiffs' invitation to read either term to encompass dam removal.

Critical to this decision[12] is the fact that the VDSA defines "alteration" as follows:

> *"Alteration"* means changes to an impounding structure that could alter or affect its structural integrity.  Alterations include, but are not limited to, changing the height or otherwise enlarging the dam, increasing normal pool or principal spillway elevation or physical dimensions, changing the elevation or physical dimensions of the emergency spillway, conducting necessary repairs or structural maintenance, or **removing the impounding structure**.

Va. Code § 10.1-604 (emphasis added).  That definitional choice—to include removal as an aspect of "alteration"—is controlling.  The VDSA repeatedly distinguishes between "operation" and "alteration," confirming they are distinct statutory categories.  *E.g.*, Va. Code § 10.1-613.1(A)(1) (prohibiting a person from "operat[ing], construct[ing], **or** alter[ing] a dam without approval" (emphasis added)); § 10.1-613.3 (addressing "alteration" in subsection (1) and—separately— "operation" in subsection (2)).  This repeated separation forecloses any inference that "operation" subsumes alteration or removal, and it demonstrates that the omission of "alteration" from among the discrete liability-triggering events (operation or failure) was an intentional choice.  *See Miller & Rhoads Bldg.*, 790 S.E.2d at 487 ("'In interpreting statutory language, we have consistently applied the time-honored principle *expressio unius est exclusio alterius*,' because this maxim

---

[12] Above and beyond the fact that reading either "failure" or "operation" to include "removal" would clearly necessitate an expansion of either term's ordinary meaning, *cf. Hill*, 82 S.E.2d at 476; *Chaudhri*, 134 F.4th at 179.

'recognizes the competence of the legislature to choose its words with care.'" (quoting *Va. Dep't of Health v. NRV Real Estate, LLC*, 677 S.E.2d 276, 279 (Va. 2009))).

Moreover, subpart C of the "Liability of owner or operator" provision of the VDSA references the "decommissioning" of an impounding structure "[p]rior to dissolution or termination of an entity that owns an impounding structure," Va. Code Ann. § 10.1-613.4(C), again demonstrating that the process of dam removal was expressly contemplated alongside—but held separate from—operation and maintenance. Accordingly, the Court finds that reading "operation" or "failure" to include removal would collapse a statutory distinction the General Assembly deliberately preserved. The Court will not adopt a construction that would otherwise render this distinction meaningless. *CVAS 2, LLC v. City of Fredericksburg*, 766 S.E.2d 912, 916 (Va. 2015) (noting the Virginia Supreme Court's "repeated admonition of making any portion of a statute meaningless or surplusage." (cleaned up)). Here, the statute's structure confirms that operation and alteration are separate regulatory categories, each governed independently.

Because § 10.1-613.4 limits liability to damages resulting from the operation or failure of an impounding structure, and because dam removal is explicitly defined as an act of alteration, not operation or as an element of failure, the VDSA does not create a cause of action for damages arising from dam removal. Count III therefore fails as a matter of law to the extent it is premised on the removal of the Ashland Mill Dam.

2. The VDSA Does Not Contemplate Plaintiffs' Alleged Damages

With respect to the remaining aspect of Count III, i.e., the claim that Hanover is liable for property damage caused by Hanover's failure to maintain the Ashland Mill Dam in good repair and the resulting partial failure of the dam, the Court finds that the "property damage" the VDSA was designed to protect is not the property damage alleged by Plaintiffs, and therefore Plaintiffs have failed to allege an injury sufficient to establish standing to sue under the VDSA.

20

In support of its Motion to Dismiss, Hanover challenges Plaintiffs' VDSA Counts[13] on two distinct grounds, both of which are shades of a standing challenge:  (1) Plaintiffs are not members of the class protected by the statute, which applies only to downstream—not upstream—property owners; and (2) Plaintiffs' injuries—namely, diminished water levels that prevent the operation of even small vessels such as canoes and kayaks; destruction of fish spawning beds, thereby eliminating Plaintiffs' ability to fish in the river; loss of the Arners' water views; and a resulting reduction in property value—are not injuries the VDSA was drafted to prevent.  Hanover Mem Supp. 9–10.  The Court is not entirely persuaded as to Hanover's first argument, but it agrees with Hanover that the particular form of injury alleged here is outside the scope of the VDSA and therefore cannot form the basis for a valid claim.

### a. Class Protected by the VDSA

Hanover contends that, as upstream property owners, Plaintiffs are not eligible to sue under the VDSA, as the VDSA is directed at protecting downstream persons and property from flooding and harms associated with dam failure or malfunction.  *Id.*  The Court reads this as a "statutory standing" argument.  As described by the Fourth Circuit, statutory standing is distinct from Article III (constitutional) standing, and also distinct from the judicially created doctrine of "prudential standing."  *CGM, LLC v. BellSouth Telcoms., Inc.*, 664 F.3d 46, 52 (4th Cir. 2011).  For its part, "[s]tatutory standing applies only to legislatively created causes of action and concerns whether a statute creating a private right of action authorizes a particular plaintiff to avail herself of that right of action."  *Id.* (cleaned up) (quoting Radha A. Pathak, Statutory Standing and the Tyranny of Labels, 62 Okla. L. Rev. 89, 91 (2009)).  The Fourth Circuit "has framed the statutory standing

---

[13] Hanover attacks Counts III and IV together, as Plaintiff's negligence *per se* theory of Count IV is predicated on the alleged violation of the VDSA.  However, as the Court has discussed, negligence *per se* requires there to be an underlying duty and cause of action at common law, and as no relevant duty exists on the present facts, Count IV necessarily fails alongside Count II.  *See supra* Part IV.B.

inquiry as whether the plaintiff 'is a member of the class given authority by a statute to bring suit.'"

*Id.* (quoting *In re Mutual Funds Inv. Litig.*, 529 F.3d 207, 216 (4th Cir. 2008)).

In support of this position, Hanover argues that "[t]he word 'downstream' appears fourteen times in the VDSA," while "[t]he word 'upstream' appears only at Virginia Code § 10.1-609.2, which discusses prohibited vegetation near a dam." Hanover Mem. Supp. at 9, n.2. Hanover further argues that Virginia's dam safety regulations, promulgated pursuant to Virginia Code § 10.1-605, reinforces its view. *Id.* at 9 (citing 4VAC 50-20-40(B), which provides: "For the purpose of this chapter, hazards pertain to potential loss of human life or damage to the property of others **downstream** from the impounding structure in event of failure or faulty operation of the impounding structure or appurtenant facilities." (emphasis added)). Additionally, Hanover explains that

> [t]he Virginia Dam Safety Program Enforcement Manual ('VDSA Manual') prepared by the Virginia Department of Conservation & Recreation states: "As part of the informal enforcement progress, DCR staff may conduct an initial informal enforcement meeting with dam owners to help them better understand their responsibilities with respect to the dam's care and maintenance and to those residents downstream of the dam."

*Id.* (quoting VDSA Manual at 7, *available at* https://www.dcr.virginia.gov/form/dcr-vswcb-041.pdf [https://perma.cc/DB5V-JB8V]).[14]  Finally, Hanover notes that "[o]nly 'owners of **downstream** property' receive notice under the 'Emergency Preparedness Plan' discussed at 4VAC 50-20-30, and '[a]ll impacted public and private roadways **downstream** or across an

---

[14] As Plaintiffs properly observe, and as the VDSA Manual makes clear, "[t]he guidance in the Manual does not carry the force of law; it is intended to provide a framework for ensuring fair and consistent enforcement of the Virginia Dam Safety Program throughout the Commonwealth . . . In addition, DCR may deviate from this guidance as it deems necessary to carry out the intent of the Virginia Dam Safety Act and Regulations." Pls.' Hanover Resp. 17 (quoting VDSA Manual at 4). Accordingly, while the Court has considered the Manual as a potentially informative interpretive aid, it affords it limited weight and instead grounds its analysis primarily in the plain language of the statute.

impounding structure shall be considered in determining hazard potential classification.'" *Id.* at 10 (quoting 4VAC 50-20-45 (emphases in brief)).

Plaintiffs respond that the statute does not expressly limit its protections to downstream owners and that no such limitation should be implied, particularly if based on purely advisory regulatory materials. Pls.' Hanover Resp. 16–17.

The Court agrees with Hanover that the statutory scheme strongly reflects a downstream-focused regulatory purpose. For example, in addition to the many statutory provisions and secondary resources relied upon by Hanover, section 10.1-607.1 of the VDSA, titled "Criteria for designating a dam as unsafe[,]" states that a dam shall be designated as unsafe if it "has serious deficiencies in its design or construction or has a physical condition that if left unaddressed could result in a failure that may result in loss of life or significant damage to **downstream property**." Va. Code Ann. §§ 10.1-607.1(A)(1) (emphasis added). That said, the Court is reluctant to categorically exclude upstream property owners from the VDSA, particularly when other agency-promulgated purpose-statements are more general and do not include a "downstream" qualifier. *E.g.*, Va. Dep't Conservation & Recreation, DCR-VSWCB-019, Guidance Document on Impounding Structure Ownership (2016) ("The Virginia Dam Safety Program's mission is to protect the lives and property of the Commonwealth's citizen's from natural and manmade flooding in accordance with 4VAC 5020-20.A."). Rather than delve into the legislative history of the VDSA to resolve this question, *see BellSouth*, 664 F.3d at 53 ("[W]here the statutory language provides a clear answer, our analysis begins and ends with that language[,]" but "[i]n the face of ambiguities, we then look to legislative intent."), the Court proceeds to Hanover's alternative standing challenge, which is more readily discernable and—more importantly—dispositive.

### b. *Damages Cognizable under the VDSA*

Hanover's second challenge is that "decreases in water levels" experienced by property owners upstream of a dam when it fails or is removed is not something the VDSA was designed to protect property owners from, and thus the "property damage" alleged by Plaintiffs is not cognizable under the Act. Hanover Mem. Supp. 9–11; Hanover Reply 10. The Court reads this to be a "prudential standing" challenge. As again articulated by the Fourth Circuit in *BellSouth*, "[p]rudential standing encompasses several judicially-created [sic] limits on federal jurisdiction, 'such as . . . the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked.'" 664 F.3d at 52 (quoting *Allen v. Wright*, 468 U.S. 737, 751 (1984)).

The VDSA opens the door to private, civil liability only for "damage to the property of others or injury to persons, including the loss of life[,] resulting from the operation or failure of an impounding structure." Va. Code Ann. § 10.1-613.4. Although the statute does not define "damage" and the ordinary meaning of that word is broad, the structure and text of the statutory scheme reflect a clear focus on tangible, physical harms associated with dam failure—most notably flooding, structural damage, and personal injury.

This focus is reinforced throughout the Act. Section 10.1-609 imposes civil penalties for unsafe dams, with an evident emphasis on flood prevention and public safety. *See* Va. Code Ann. §§ 10.1-603.17, -603.19. Further, § 10.1-607.1(A)(2) provides that a dam shall be deemed unsafe if "[t]he design, construction, operation, or maintenance of the dam is such that its expected performance **during flooding conditions** threatens the structural integrity of the dam." (emphasis added). Read together with subsection (A)(1),[15] this provision underscores that the VDSA is

---

[15] As noted *supra*, this provision states that a dam shall be designated as unsafe if "[t]he dam has serious deficiencies in its design or construction or has a physical condition that if left unaddressed could result in a failure that may result in loss of life or significant damage to **downstream property**." (emphasis added).

24

principally[16] concerned with preventing downstream, flood-related harms—to both property and persons, including loss of life. Consistent with this purpose, the statutory and regulatory framework repeatedly identifies downstream flood risks—not water level maintenance or recreational use—as the relevant hazard. *See, e.g.*, Va. Code Ann. § 10.1-605 (providing for the promulgation of regulations by the Soil and Water Conservation Board, and repeatedly reiterating a focus on downstream safety); 4VAC 50-20-40(B), Impounding Structure Regs. ("For the purpose of this chapter, hazards pertain to **potential loss of human life or damage to the property of others downstream** from the impounding structure **in event of failure or faulty operation** of the impounding structure or appurtenant facilities." (emphases added)).

Plaintiffs do not allege any damage attributable to flooding. Instead, they seek damages based on loss of access to the river, reduction in water level, destruction of fish spawning beds, destruction of water views (with respect to the Arners), and a substantial reduction in property value. Compl. ¶¶ 65, 69. Plaintiffs contend that these injuries are among "the type of damage that the [VDSA] was intended to protect." *Id.* ¶ 74. But this is a legal conclusion, not entitled to a presumption of truth. In their opposition to Hanover's Motion to Dismiss, Plaintiffs point to nothing more than the fact that the VDSA is silent with respect to upstream properties. Pls.' Hanover Resp. 16.

Plaintiffs' argument is unpersuasive, and the Court declines to read into the VDSA that which its drafters so obviously chose not to include. From its name—the Virginia Dam **Safety** Act—to its textual contents, and on to its implementing regulations, it is clear that the "zone of interests protected by the [VDSA]" is public safety, not the simple use and enjoyment of riparian property. *BellSouth*, 664 F.3d at 52 (quoting *Allen*, 468 U.S. at 751); *see* 4VAC50-20-20(A),

---

[16] The Court writes "principally" because, again, it is reluctant to foreclose the possibility of upstream **flooding** caused by the improper operation of an impounding structure.

Impounding Structure Regs. ("This chapter provides for the proper and safe design, construction, operation and maintenance of impounding structures **to protect public safety**.").[17]

Because Plaintiffs' alleged injuries fall outside the zone of interests contemplated by the VDSA, prudential standing is not satisfied, and Plaintiffs therefore fail to state a claim for relief under Count III.

### V. CONCLUSION

For the reasons detailed above, the Court finds that Plaintiffs have failed to state a claim for private nuisance, common law negligence, and negligence *per se*, and further that they lack standing to assert a claim under the VDSA. Defendants' Motions to Dismiss have accordingly been granted. *See* Order, ECF No. 18.

/s/ _____
Roderick C. Young
United States District Judge

Date: May 26, 2026
Richmond, Virginia

---

[17] Even assuming, *arguendo*, that the statute was susceptible to the reading advanced by Plaintiffs, established principles of statutory construction compel a narrower interpretation. "[I]f a statute is subject to more than one interpretation, courts must adopt the construction that best effectuates legislative intent." *Conyers v. Martial Arts World*, 639 S.E.2d 174, 178 (Va. 2007). Here, the evident legislative purpose—preventing downstream, flood-related dangers posed by unsafe dams—forecloses an interpretation that would extend liability to enjoyment- and property value-related injuries arising from reduced upstream water levels or the cessation of impoundment.